1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3     UNITED STATES OF AMERICA        :

4               v.                    :   CRIMINAL NO. 01-CR-224-01

5     ALFRED A. MELE,                 :
                    Defendant
6

7

8
                     TRANSCRIPT OF PROCEEDINGS
9                    HEARING ON A 2255 MOTION
                  TESTIMONY OF SMITH B. GEPHART
10

          Before:  Hon. Sylvia H. Rambo, Senior Judge
11

12          Date:  July 25, 2003

13          Place:  Courtroom No. 3
                    Federal Building
14                  Harrisburg, Pa.

FILED

JUL 29 2003

MARY E. D'ANDREA, CLERK
PER_____ HBG, PA DEPUTY CLERK

15

16

17     COUNSEL PRESENT:

18          CHRISTY H. FAWCETT, Assistant U.S. Attorney

19               For - Government

20          CHERYL J. STURM, Esquire

21               For - Defendant

22

23

24
                              Monica L. Zamiska, RPR
25                            Official Court Reporter

INDEX TO WITNESS

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Government: | | | | |
| Smith B. Gephart | 3 | 15 | 30 | 33 |

INDEX TO EXHIBITS

|  | Identified | Admitted |
|---|---|---|
| For the Government: | | |
| G X 1 (Gephart Commonwealth Telephone records 5-99) | 5 | |
| G X 2 (Gephart Commonwealth Telephone records 5-99) | 11 | |
| G X 3 (5-27-99 Gephart handwritten notes) | 13 | |
| For the Defendant: | | |
| D X 13 (Government's response to 2255 motion) | 23 | |

1           MS. FAWCETT:  The government calls Attorney

2     Gephart.

3           SMITH B. GEPHART, called as a witness, being duly

4     sworn or affirmed, testified as follows:

5           THE CLERK:  Would you state your name please.

6           THE WITNESS:  My name is Smith B. Gephart.

7           THE CLERK:  And would you spell your first and last

8     name please.

9           THE WITNESS:  Smith, S-m-i-t-h, Gephart,

10    G-e-p-h-a-r-t.

11          THE CLERK:  Thank you.

12                    DIRECT EXAMINATION

13    BY MS. FAWCETT:

14    Q     Mr. Gephart, you are an attorney-at-law.  Is that

15    correct?

16    A     That's correct.

17    Q     And are you admitted to practice in the Middle District

18    of Pennsylvania?

19    A     I am.

20    Q     How long have you been employed as an attorney?

21    A     Roughly 36 years.

22    Q     And where is your office located?

23    A     218 Pine Street in the City of Harrisburg.

24    Q     Can you give us an idea during your 3- -- approximately

25    36 years of practice how many criminal defendants you have

1    represented?

2    A    Oh, hundreds, I guess.  I was five years with the

3    county public defender's office while I was in private

4    practice.

5    Q    Okay, and of those approximate hundreds of criminal

6    defendants that you have represented during your years of

7    practice, can you give us an idea of how many of those

8    criminal defendants have been criminal defendants in federal

9    court?

10   A    Oh, I don't know.  I probably moved over and started

11   doing federal work 25 years ago roughly.

12   Q    Okay, can you put any sort of a figure or an estimation

13   on the number of criminal defendants you have represented in

14   federal court in that 25 years?

15   A    I'm sorry, I can't, hundreds.

16   Q    Okay, and is it accurate to say that sometime during

17   1999 you engaged in the representation of "Sonny" Mele?

18   A    Yes.

19   Q    Can you give us your best recollection concerning how

20   you came to be representing him?

21   A    Yes, in April of 1999 my partner Terry McGowan, who

22   does criminal work in the firm also, was contacted by Mr.

23   Mele.  As I recall, he was contacted because Mr. Mele had

24   received a subpoena to come to Harrisburg for handwriting

25   exemplars and prints.  I don't know if he ever did that.

1          Sometime between then and May 19 he was scheduled to

2     come to Harrisburg for an appointment with Special Agent

3     James Stewart of the FBI and Sally Lied, who was an Assistant

4     U.S. Attorney.  I knew nothing about the case up to this

5     point till Mr. McGowan, who had something else, I guess a

6     conflict, asked me if I would handle this.  The purpose of

7     the meeting was to have him sit and listen to what the agent

8     and the U.S. Attorney said they could prove against him in

9     the matter involving odometer rollbacks.

10          I met him on the 19th, Mr. Mele; that is, on the 19th of

11     May for this meeting in the morning.

12          Two days ago I pulled the telephone records and -- to

13     see if anything there would help me recall these things, they

14     happened four years ago, and on the 17th, that would have

15     been two days before the meeting, I found that I did make a

16     -- I placed a phone call to Mr. Mele up in Staten Island.  It

17     was I think less than a minute call, and that call was

18     probably to make sure he hadn't forgotten the meeting.

19     Q     Okay, I'm going to hand you --

20               MS. FAWCETT:  May I approach the witness, Your

21     Honor?

22               THE COURT:  Yes.

23     BY MS. FAWCETT:

24     Q     I'm going to hand you what we have marked as

25     Government's Exhibit No. 1 and ask you if you recognize what

1    this is?

2    A    Yes, that's the original Commonwealth Telephone bill

3    that we received in the office which has been in my basement

4    files of my office for the past four years.  I went down and

5    personally pulled this on Wednesday of this week, and that

6    shows that on the 17th of May, 1999 I placed a call to Staten

7    Island, New York to Mr. Mele's telephone number, and the call

8    lasted just short of one minute.

9    Q    And can you recite for us the telephone number that you

10   called as it's reflected on Government Exhibit No. 1?

11   A    Yes, 718-356-0129.

12   Q    And if I understand your testimony correctly, your

13   recollection is that's the call that was placed to remind Mr.

14   Mele of a meeting?

15   A    I'm assuming that's why I made that call two days

16   before the meeting, to make sure he was going to be here.

17   Q    And your testimony is that the meeting occurred on May

18   19?

19   A    The meeting did occur on May 19.

20   Q    Okay, and prior to the meeting that was held on that

21   day with Agent Stewart and Miss Lied, did you meet with Mr.

22   Mele?

23   A    Prior to the meeting I don't recall that I met with

24   him, I might have.

25   Q    Okay.

1    A    I might have had a telephone contact to make sure the

2    meeting was still on, the time was the same.

3    Q    Okay, can you give us your recollection concerning the

4    meeting that occurred on May 19 then of 1999?

5    A    Yes, Mr. Mele, I don't know if he took a train in or

6    drove in, met me in my office, we talked for a few moments.

7    I recall telling him the purpose of the meeting at this

8    juncture was just to listen, we weren't going to have any

9    conversation with the agent or with the Assistant U.S.

10   Attorney.

11       We met, as I recall, in the FBI office, and the meeting

12   went, oh, an hour or maybe a few minutes less than an hour.

13   During the meeting Mr. Mele didn't say anything.  I didn't

14   say anything.  We listened to Sally Lied and Agent Stewart

15   where they outlined what they thought they could prove at

16   that juncture.

17       And when we left, as I recall, I either asked Mr. Mele

18   to meet me downstairs here in the building or to meet me back

19   in my office.

20       At any rate, I did talk then further with Sally Lied.

21   I think I went up to her office.  At that time I had a

22   Castigar letter, which essentially just says that if we want

23   to make a proffer, anything that -- and any plea bargain

24   falls through, anything that Mr. Mele would say would not be

25   used or could not be used against him at trial.  I also had a

1    second letter that Sally Lied had prepared.  As I recall,

2    both those letters were dated the 17th, and I don't -- I

3    don't know when I picked them up.

4        The second letter had a couple of scenarios that Sally

5    Lied had outlined under the money laundering statute.  One

6    with the more severe section of that statute which would

7    expose you to up to 20 years.  The second one with

8    cooperation which would expose him I think to something like

9    10 years.  That's what I had in the way of documents, and

10   anyhow that was the meeting.

11       I went up to talk to Sally Lied for a few minutes and

12   in an effort to see if these things were negotiable.

13   Q    Okay.

14   A    I went back to my office, talked with Mr. Mele and told

15   him that he should let me know, you know, whether we should

16   continue and try and do some plea bargaining on this matter

17   or what he wanted to do.  I did tell him that I would not be

18   trying the case, if he elected to go to trial, that would

19   have to be Mr. McGowan or another lawyer.

20   Q    And during the conversation with Sally Lied was there

21   any discussion concerning what plea offer was open for Mr.

22   Mele?

23   A    I don't recall.  I do know that the day after that

24   meeting, the 20th, I did meet with Agent Stewart to see if

25   there was any maneuvering room.  I don't recall -- I do know

1    I met with him, and I don't recall whether he held out any

2    hope or not.

3    Q    Okay, and what is your recollection concerning what Mr.

4    Mele told you during your conversation after that May 19

5    meeting when you informed him that he should let you know

6    whether he wanted to proceed to trial or wanted to try to

7    engage in plea negotiations?

8    A    Well, Mr. Mele didn't say too much.  I mean, this was

9    an awful lot for him I think to try and digest, and he had

10   heard a lot of accusations, if you will, for almost an hour,

11   and it was proper that he was going to think about this.  I

12   don't recall the conversation.  He was to let me know what he

13   wanted to do.

14   Q    All right, were there any communications between you

15   and Mr. Mele after May 19 concerning whether or not he wanted

16   to be -- or wanted to engage in a plea agreement with the

17   government?

18   A    Well, I didn't hear from him, and I didn't talk with

19   him for a week.  I think it was a week later that I received

20   a phone call from Agent Stewart, and I'm sure the purpose of

21   that call was to find out what Mr. Mele wanted to do.  It was

22   late in the day, and I placed a call to Mr. Mele's home in

23   Staten Island, and at that time, as I recall now and looking

24   at the documents that I had, there was a phone call up there,

25   Mr. Mele wasn't there.  I talked with whom I assume was Mrs.

1    Mele at that time and asked her to have him call me.  I think

2    it was around four o'clock in the afternoon when I made that

3    call according to the phone record, and again the phone

4    conversation was less than a minute, so I'm sure it wasn't

5    Mr. Mele on the other end.  I rather think it was his wife.

6    I do recall talking to her at one point.

7         And I was around the office in those days I went home

8    about six o'clock in the evening.  I didn't hear from him,

9    and I was concerned because I was leaving town early the next

10   morning for a week.  And the next morning before I left town

11   I came down to the office and I missed Mr. Mele's phone call

12   by about five minutes.  He had returned my call from the

13   night before.

14        At that juncture I called him back and spoke with him,

15   and that's when I made the note of, you know, a brief note of

16   that conversation.

17   Q    Okay, the two telephone calls that you have described

18   that occurred on May 26, the short one that you believe was

19   with Mrs. Mele and the telephone conversation that occurred

20   on May 27, which was the longer telephone conversation with

21   Mr. Mele, are those reflected in your telephone records from

22   your office?

23   A    Yes.

24        MS. FAWCETT:  May I approach the witness again,

25   Your Honor.

1        THE COURT:  Yes.

2   BY MS. FAWCETT:

3   Q    I'm handing you what's been marked Government's Exhibit

4   No. 2 and ask you if you can note for the Court where those

5   two telephone conversations are reflected in that record?

6   A    Yes, this again is the original of a Commonwealth

7   Telephone bill that we received, has been in the basement in

8   the file room of my office the past four years.  It shows

9   that on May 26, 1999 at 4:18 in the afternoon I placed a call

10  to Staten Island to Mr. Mele's telephone number, and that

11  telephone conversation lasted again less than a minute, and

12  that's when I think I talked with Mrs. Mele and asked her to

13  have her husband call me.

14       The next day on May 27 at 8:12 a.m. in the morning I

15  placed another call to Mr. Mele's home in Staten Island, and

16  that's when I spoke, and I believe it must have been with Mr.

17  Mele, and that conversation lasted about five and a half

18  minutes.

19  Q    Okay, and if I asked you this question before, I

20  apologize, did you relate to us what you recall occurring in

21  that second telephone conversation, the longer telephone

22  conversation?

23  A    What occurred?

24  Q    Yes.

25  A    I asked him if he made up his mind what he wanted to

1    do, that I had been, you know, been contacted by the FBI

2    agent, and at that time Mr. Mele had told me that he had

3    decided not to enter into a plea agreement at this time.

4    Q    Okay, you testified previously I believe that you had

5    missed the first telephone call from Mr. Mele on May 27, 1999

6    by about five minutes.  Is that correct?

7    A    Yeah, ordinarily I'm in my office around seven o'clock

8    in the morning.  However, I was leaving town that Thursday

9    morning, and I was packing my car, so I didn't get to the

10   office until about eight o'clock, and I came down

11   specifically to try and get Mr. Mele again on the phone, I

12   didn't want to leave this thing hanging while I was gone for

13   a week.  And if I couldn't get him, I was going to call Agent

14   Stewart and ask him if he could put things on the back burner

15   for a week until I came back.

16        When I came to the office, my partner had been there,

17   and she had received the phone call from Mr. Mele about five

18   minutes before I arrived.

19   Q    Okay.

20   A    And I then returned that call.

21   Q    All right, and was the notation that Mr. Mele had

22   called about five minutes before you arrived, was that noted

23   anywhere?

24   A    Well, no, it wouldn't be on the phone bill because he

25   placed the call.  I believe, however, in the little note I

1    made that was in my file that the time that call came in is

2    noted.

3    Q    Okay, and your -- the substance of the longer telephone

4    conversation that you then had with Mr. Mele when you called

5    him back, is that recorded anywhere?

6    A    In the note that I had in the file, yes.

7    Q    All right.

8         MS. FAWCETT:  May I approach the witness again,

9    Your Honor.

10        THE COURT:  Yes.

11   BY MS. FAWCETT:

12   Q    I'm going to hand you Government's Exhibit No. 3 and

13   ask you if you recognize what that is?

14   A    Oh, yes.  Yes, this is a note up at the top it says:

15   7:55 a.m. on May 27, 1999, SBG call Mr. Mele.  SBG being me.

16   And then Mr. Mele's phone number.  Signed Paula.  That would

17   be Paula McDermott, who at that time was a partner in my law

18   firm.

19   Q    And can you tell us what's written right below that?

20   A    Yeah, I wrote that note when I was talking with Mr.

21   Mele.  It says:  "Sonny", that's Mr. Mele's nickname, "Sonny"

22   will not enter into plea bargain at this time, explained

23   again that if he wants any benefit, must plea bargain before

24   the charges are brought.  Any questions call Terry while I am

25   out of town.  That would be Terry McGowan.

1          Ordinarily if I weren't leaving town that morning and I

2     was getting ready to go, I would have just picked up my

3     recorder and written a memo to the file. However, I jotted

4     that down, put the file on my desk, and I never wrote the

5     memo to the file. But that's the original note that I

6     received and that I wrote on May 27, 1999.

7     Q     And the sentence in that note that says explained again

8     that if he wants any benefit, must plea bargain before

9     charges brought --

10    A     Yeah, what I meant by that was once charges are brought

11    under the money laundering statute, you know, it's too late

12    to enter into an effective plea agreement. I was hoping that

13    if he wanted to plea bargain, that we could, you know, maybe

14    have the U.S. Attorney and the FBI agree to another charge

15    with a lesser guideline penalty.

16    Q     Okay, does that reflect the substance of your

17    conversation with him?

18    A     Yes, it did.

19    Q     Okay, do you recall whether or not you talked to Mr.

20    Mele at any time after May 27, 1999?

21    A     No, I mean, I recall that I never did. I kept the file

22    on my desk for a while, I know that. I never heard from him

23    again until I received the call from you a month ago or

24    whenever it was. I hadn't even followed the case.

25          MS. FAWCETT:  Okay, I have no further questions.

1          THE COURT:  Cross examine.

2                    CROSS EXAMINATION

3     BY MS. STURM:

4     Q     Mr. Gephart, how many criminal cases have you handled

5     since 1999?

6     A     I have handled none.

7     Q     How many criminal cases have you handled since the

8     federal sentencing guidelines came into effect?

9     A     Well, they went in in '87 I believe.  I have no idea

10    how many.  I handled several under the federal sentencing

11    guidelines, however.

12    Q     Ten?

13    A     More, 20, you know, I don't really keep records of

14    those.

15    Q     When was the last time you did handle a federal

16    criminal case?

17    A     It was before 1999.  I was having problems in 1999.

18    About the time this happened I was having problems speaking,

19    and that's why I had to give up trial work.  I didn't know

20    what the trouble was, but, you know, whatever it was, I

21    couldn't speak very well.  I found out later it was throat

22    cancer, and for the balance then of 1999 I was kind of laid

23    up.  So that's why I haven't handled any criminal cases

24    since.

25    Q     When you went to the Federal Building with Mr. Mele,

1    did you review any documents while you were there that day?

2    A    I don't recall that we did.

3    Q    Did the government lay out its case against Mr. Mele at

4    that point?

5    A    As I recall it, yes, Mr. Stewart and Sally Lied told

6    him that this is what they could prove right now.  This is

7    the number of cars that were allegedly had the odometers

8    rolled back in, this would be the amount of money.  If he

9    wanted to cooperate with the government, they would stop the

10   investigation and cap it whatever figure that was, and I

11   don't recall that they showed him any documents that day.

12   Q    What did you think of the strength of the government's

13   case against Mr. Mele?

14   A    I had no idea.  You know, when they lay it out, it all

15   sounds bad.  Mr. Mele and I didn't discuss whether he was

16   involved in this or not.  So, you know, I had no idea what

17   their strength was.  If everything she said was true, then,

18   you know, she was building a case for money laundering.

19   Q    And you're saying that at no time did Mr. Mele tell you

20   what his involvement in the crime was?

21   A    No.

22   Q    Did you ask him what his involvement in the crime was?

23   A    No.

24   Q    Did -- when you were discussing the matter with Miss

25   Lied, did she present a scenario where Mr. Mele could plead

1    guilty without one of the charges being money laundering?

2    A    No.

3    Q    Did you propose any terms for a plea agreement to Miss

4    Lied?

5    A    I'm sorry, did I --

6    Q    Did you suggest any terms for a plea agreement to Miss

7    Lied?

8    A    Not at that time.  The purpose for that visit was to

9    listen, and that's all we did.  I told Mr. Mele before we

10   went down there, you know, we didn't want to make any

11   statements, and he was very good, he didn't say a word nor

12   did I.

13   Q    After you and Mr. Mele were present with Miss Lied and

14   the agent, did I understand your testimony correct that you

15   remained behind to speak to Miss Lied at that point?

16   A    Yeah, that's my recollection, Miss Sturm.  I either

17   asked him to go back to my office or perhaps meet me

18   downstairs here in the Federal Building in the coffee shop.

19   I do recall going up to, for a few minutes, to Sally Lied's

20   office, however.  I think it was one flight up or something,

21   and then I met with Mr. Mele.

22   Q    And did you -- when you were finished meeting with Miss

23   Lied, did you have the terms of a plea agreement to tell Mr.

24   Mele about, did you have some parameters of what kind of a

25   plea the government was willing to offer?

1    A    I had the -- there were two letters.  As I said, one

2    was a Castigar letter, and the second was an outline of what

3    -- a general outline of what they thought they could prove,

4    and in that she laid out two scenarios under the sentencing

5    guidelines.  One of which would have given him like 41 months

6    or something in jail within the guideline range, and the

7    other one something less.

8    Q    And do you have that letter with you today?

9    A    Yeah, I think it's in my file back there.

10        MS. STURM:  Your Honor, may I request an

11   opportunity to review the letter?

12        THE WITNESS:  Oh, sure.  I mean, I'm sorry.

13        THE COURT:  Yes.

14        MS. FAWCETT:  May I approach the witness with the

15   file, Your Honor.

16        THE WITNESS:  Bring them both up, let me see them.

17   Thanks.  Yes, I have both letters right here.

18        THE COURT:  I'll tell you what, Mark, would you

19   make copies?  Make a copy for Miss Sturm, the government and

20   me.

21        MS. STURM:  Your Honor, I can come back to the

22   letter.  I'll continue with another line of questioning.

23        THE COURT:  Go ahead.

24   BY MS. STURM:

25   Q    Did you give Mr. Mele your advice as to whether he

1    should take the plea bargain?

2    A    I, you know, I don't recall a conversation in any

3    specific detail four years ago.  I told Mr. Mele that this is

4    something where he'd have to make a decision.  If he wanted

5    to plea bargain, then we would start plea bargaining.  He had

6    to let me know.

7    Q    So, in other words, you told Mr. Mele that the decision

8    was his to make?

9    A    Absolutely.

10   Q    Did you give Mr. Mele -- did you have an opinion as to

11   what was the best course of action for Mr. Mele?

12   A    If I did, I sure didn't express it to Mr. Mele.

13   Q    Thank you.  Is it correct it was very early in the

14   criminal investigation when you went to the Federal Building?

15   A    You know, I don't know that, Miss Sturm.  As I recall

16   though, there had already a month before been the subpoena

17   issued, I think a grand jury subpoena, for Mr. Mele to come

18   down and give handwriting exemplars.  So I don't know how far

19   along the investigation had gone at that point.

20   Q    When you were meeting with Miss Lied, did she list for

21   you and Mr. Mele all of the potential witnesses that the

22   government -- all the potential names of people already

23   cooperating with the government?

24   A    No, I don't recall that she did.  She mentioned names,

25   but it seems to me the names she mentioned were names that --

1    of people that they wanted Mr. Mele to testify about.  I

2    don't recall that.  You know, I think at that juncture what

3    her position was, if Mr. Mele wants to cooperate, it better

4    be soon, but I can't tell from that whether the investigation

5    had been going for a year, a month or six months.

6    Q    At any time during your representation of Mr. Mele did

7    you explain the federal sentencing guidelines to him?

8    A    I don't believe that we went into any detail.  I

9    explained what they were.  I would have to, you know, spend

10   hours going over the sentencing guidelines with somebody, I

11   know I didn't do that.

12   Q    Well, did you explain the sentencing guidelines to him

13   before you went over to meet with Miss Lied or after you went

14   and met with Miss Lied?

15   A    That would be after.

16   Q    Okay, and where did you do this?

17   A    In my office.

18   Q    And so your testimony now is that you met in your

19   office, not in the coffee shop?

20   A    No, no, if we -- I either told him to come back to my

21   office and I'd meet him there or wait for me downstairs in

22   the coffee shop.  We didn't -- if he met me in the coffee

23   shop, we wouldn't have discussed any business, we would have

24   walked back to my office.  It's only a block away.

25   Q    And what did you tell Mr. Mele about the federal

1    sentencing guidelines?

2    A    I don't recall other than these guidelines would be

3    basically the parameters which he could be sentenced by the

4    federal judge if he pled guilty.

5    Q    And did you explain acceptance of responsibility to Mr.

6    Mele at any time?

7    A    I don't recall, Miss Sturm, my conversation with him.

8    I didn't go into big details at that juncture with Mr. Mele

9    as to these guidelines.

10            THE COURT:  Excuse me a minute, it looks like the

11    copy I have is the same.  There should be two different

12    letters, am I correct?

13            MS. STURM:  I have the same also, Your Honor.  I

14    think --

15            THE WITNESS:  Oh, oh, I'm sorry, hold on one second

16    if you would.  I think what you have, Your Honor, it was my

17    fault.  You have a copy of the -- what I refer to as the

18    Castigar letter.  There is a second letter.

19            THE COURT:  Do you have that one?

20            THE WITNESS:  I have that.  This is a four page

21    letter dated the same day where Sally Lied lays out the two

22    scenarios.  Sorry about that.

23            THE COURT:  So if you have an extra copy there you

24    don't need, we'll make a copy.

25            THE WITNESS:  Yes.

1          THE COURT:  Thank you.  Sorry, Miss Sturm, go

2    ahead.

3    BY MS. STURM:

4    Q    At any time did you explain to Mr. Mele what a 5K1.1

5    letter was?

6    A    A 5K1, only if I did, it would be --

7    Q    Do you have a specific recollection of whether you did

8    or did not?

9    A    I do not.

10          MS. FAWCETT:  Your Honor, could the witness finish

11    the answer to the question?

12          THE COURT:  I'll let you pick up on it.

13    BY MS. STURM:

14    Q    Mr. Gephart, did you have an opportunity at any time to

15    review the government's answer to the 2255 motion that was

16    filed in this case?

17    A    Yes.

18    Q    Did you review it before coming in to testify here

19    today?

20    A    Not today.  I reviewed it several days ago.

21          MS. STURM:  Your Honor, with the Court's

22    permission, may I show a copy of the government's answer to

23    Mr. Gephart.

24          THE COURT:  Yes.

25          MS. STURM:  And I believe we are at D 13 at this

1    point.

2                THE WITNESS:  I think I have it here.

3                THE CLERK:  Thirteen.

4                MS. STURM:  I'm sorry, I'm not sure where you left

5    off.

6                THE CLERK:  Thirteen.

7                THE WITNESS:  I have a copy.

8                MS. STURM:  You have a copy?

9                THE WITNESS:  Uh-huh.

10               MS. STURM:  Your Honor, may I continue to -- leave

11   it here for consistency.

12   BY MS. STURM:

13   Q    Would you look at paragraph 8 of that letter.

14   A    Yes.

15               THE COURT:  You mean of the answer, of the

16   response?

17               MS. STURM:  I'm sorry, of the answer.  The

18   government's --

19               THE COURT:  Response.

20               MS. STURM:  -- response.

21   A    Paragraph 8?

22   BY MS. STURM:

23   Q    Yes.

24   A    Accordingly the government is requesting you mean?

25   Q    Paragraph 8 of the response, I'm not -- are you sure

1    you have the same document we're talking about?

2    A    I may not.

3    MS. FAWCETT:  I can maybe clarify, Your Honor.  I

4    believe that I had initially prepared a response prior to the

5    appeal being decided by the third circuit.  That may be the

6    document that Mr. Gephart has.

7    THE COURT:  Go ahead and use this.

8    MS. FAWCETT:  They are virtually identical.  There

9    may be one additional paragraph.

10    A    Okay, thanks.

11    BY MS. STURM:

12    Q    You're welcome.

13    A    Okay, I have the paragraph 8.

14    Q    Okay, could you read that paragraph into the record

15    please.

16    A    Sure, paragraph 8:  On January 23, 2003 undersigned

17    counsel spoke with Attorney Gephart, who stated that his

18    recollection, confirmed by documentation in his file, is that

19    following a meeting involving him, his client and the federal

20    investigator and prosecutor the defendant's wife called him

21    and conveyed the message that her husband will not enter into

22    a plea agreement at this time.

23    Q    Did you tell Miss Fawcett that?

24    A    Yes.

25    Q    Is that truthful?

1    A    Well, at the time I thought it was truthful.  It is not

2    accurate.  I recalled calling New York and talking with Mrs.

3    Mele, and that at the time in January when I spoke with Miss

4    Fawcett, that's what I told her.  I had the file in front of

5    me, I looked at the note that I had, and that was my

6    recollection.

7        Two days ago, Wednesday of this week, I received a

8    phone message from Miss Fawcett reminding me that today was

9    the date for this hearing.  So I pulled the file, looked

10   through it, and when I looked through my file, it was the

11   file that Miss Fawcett had sent me, I looked at Mr. Mele's

12   statement dated September 29, and at that time I said to

13   myself, you know, "I can't -- he's forgetting something.

14   He's forgetting that I had a phone call up there to New York

15   since this happened."  So it was only then that I recalled

16   that perhaps I still had the telephone bills, Exhibits 1 and

17   2, and perhaps they would show when I made calls and how long

18   they were.  So I personally went down and retrieved these,

19   and when I looked at Exhibit 2, I believe it is, yeah, when I

20   looked at Exhibit 2, I saw then that I had made the phone

21   call the night before and hadn't gotten him, which I had

22   forgotten, and that was a call that was less than a minute,

23   and I believe that's when I spoke with Mrs. Mele.  And then I

24   noticed the call the next morning when I made the note, and

25   that was 5.4 minutes, and I believe that's when I spoke with

1    Mr. Mele.  So it was an error on my part, that was my best

2    recollection in January.

3    Q    Continuing to look at paragraph 8 and also looking at

4    the Government's Exhibit -- I'm sorry, I don't recall the

5    number, it's your handwritten note.

6    A    Oh, that's No. 3.

7    Q    Defendant's 3?

8    A    Uh-huh.

9    Q    Okay, would you read the first sentence of D 3?

10   A    "Sonny" will not enter into plea bargain at this time.

11   Q    Okay, now will you look at paragraph 8 of P 13, the

12   last sentence, the part that's in quotation marks.

13   A    Will not enter into a plea agreement at this time.

14   Q    Essentially except for the word "Sonny", that's an

15   exact quotation, isn't it?

16   A    Yeah.

17   Q    Were you not looking at D 3 when you gave that

18   information to Miss Fawcett?

19   A    Sure I was.

20   Q    And so when you looked at this document D 3 in January

21   23, 2003, you interpreted this document to mean that you had

22   a conversation with Mrs. Mele.  Is that correct?

23   A    That's what I thought because I recall having spoken

24   with her.

25   Q    And then after you read what Mr. Mele was saying about

1    you, you looked at the same document, and you decided the

2    conversation was with Mr. Mele.  Is that your testimony

3    today?

4    A    No, no, no, it was when I read his statement that --

5    which was the second time I read it.  The first time I read

6    it was when Miss Fawcett sent it to me.  When I read his

7    statement, he doesn't note that we had a further

8    conversation, and it seems to have ended when he left my

9    office that day.  And I thought, "Well, he perhaps forgot

10   about me trying to get in touch with him in New York."

11   That's when it occurred to me that maybe my phone records

12   were available and would help me flush this out.  That was

13   just two days ago.

14   Q    And is it correct that absent looking at your phone

15   records you had no independent recollection of telephone

16   conversations with Mr. Mele?  Is that correct?

17   A    That's correct.

18   Q    And absent looking at telephone records you have no

19   independent recollection of whether those conversations were

20   with Mr. Mele or Mrs. Mele.  Is that correct?

21   A    That's correct, and without looking at the phone bills,

22   you're absolutely correct.

23   Q    And looking at the phone bills, there is nothing in

24   there that tells you whether the conversation was with Mr.

25   Mele or Mrs. Mele.  Is that correct?

1    A    Only that it was five and a half minutes or 5.4

2    minutes, and I don't believe I would have spoken with Mrs.

3    Mele for five and a half minutes.

4    Q    Did Mr. Mele ever call you after you went to the

5    courthouse and ask you whether he owed you any balance of a

6    fee?

7    A    No, not me.

8    Q    He never called you about paying the balance of his

9    bill?

10   A    No, I didn't even know if he had a balance.

11   Q    Looking at what's been marked as D 3, is there anything

12   on D 3 that tells you specifically who you spoke to?

13   A    No.

14   Q    So it could have been Mrs. Mele that you spoke to that

15   day.  Is that correct?

16   A    I think so, it's possible, I don't believe it was.

17   Again I don't think I would have spoken with Mrs. Mele for

18   five and a half minutes.

19   Q    But is it possible?

20         THE COURT:  Everything is possible, Miss Sturm.

21   A    I guess anything is possible.

22   BY MS. STURM:

23   Q    Okay, and when you gave the statement to Miss Fawcett

24   that's contained in paragraph 8, you knew the significance of

25   what Miss Fawcett was going to do with this information.  Is

1    that correct?

2    A    Yes.

3    Q    That she was going to rebut Mr. Mele's claim of

4    ineffective assistance of counsel?

5    A    Yes.

6    Q    And you considered it important to be accurate in the

7    information you conveyed.  Is that correct?

8    A    Yes, I thought at that time I was accurate.  I didn't

9    tell Miss Fawcett --

10    Q    I don't have a question pending right now.  Thank you,

11    Mr. Gephart.

12    A    All right.

13         MS. STURM:  Your Honor, I may be almost done, if I

14    could just have a moment to quickly look at my notes.

15         THE COURT:  Go ahead.

16         (Pause.)

17    BY MS. STURM:

18    Q    And in this -- whoever the conversation was with that's

19    been marked as D 3, during that conversation, if it was with

20    Mr. Mele, do you recall telling Mr. Mele that his best course

21    of action was to plead guilty?

22    A    No, I don't recall that at all.

23         MS. STURM:  I have no further questions, Your

24    Honor.

25         THE COURT:  Redirect.

1                           REDIRECT EXAMINATION

2       BY MS. FAWCETT:

3       Q      Mr. Gephart, just a moment ago you were attempting to

4       explain one of your responses to Miss Sturm's question, and

5       Miss Sturm cut you off.  Could you continue that explanation

6       for us please.

7       A      As I recall, I never explained to you, Miss Fawcett,

8       that I had made an error back in January when I talked with

9       you about who I spoke with that day.  I told you that I had

10      just pulled the phone records, and the phone records would

11      show me that I probably talked with Mr. Mele on that

12      conversation on May 27 because it was 5.4 minutes, and I

13      didn't believe I would speak with Mrs. Mele for 5.4 minutes.

14      Q      Okay, and just so we're clear on the record, the bottom

15      portion of handwriting on Government's Exhibit No. 3, whose

16      handwriting is that?

17      A      That's me.

18      Q      And when did you place that handwriting on that memo?

19      A      I placed that handwriting on that memo on May 27, 1999

20      at approximately 8:12 in the morning.

21      Q      And that was just following what occurrence?

22      A      That was just following my conversation with who I

23      believe was Mr. Mele.

24      Q      And again, just so we're clear, what does that notation

25      on the bottom of Government's Exhibit 3 memorialize?

1    A    It memorializes the conversation I had up there.

2    Q    Okay, earlier in your testimony, your cross examination

3    by Miss Sturm, you were asked a question concerning whether

4    or not you had explained 5K1 -- a 5K1 motion to Mr. Mele, and

5    again she cut you off in your attempt to respond to that

6    question.  Would you continue your response.

7    A    I didn't go into the detail at all with Mr. Mele on the

8    sentencing guidelines.  I have no recollection, I'm sure we

9    discussed the sentencing guidelines in general terms and the

10    fact that if you cooperate with the government, the

11    government is in a position to make recommendations to the

12    court.  Now whether I got out the guidelines and said to him,

13    "This is 5K1, this is what this means," I have no

14    recollection of ever doing that.

15    Q    Do you have a normal course of action or a normal

16    policy concerning explaining cooperation with the government

17    with criminal defendants who are your clients?

18    A    My policy is let the defendant let me know which course

19    of action he wants me to proceed with and whether he wants to

20    see if we can explore a plea bargain or whether the answer

21    is, "No, I didn't do it.  I'm going to trial."  That's my

22    policy.

23    Q    Okay.

24    A    I don't try and sway them either way.

25    Q    All right, do you explain, is it your policy to explain

1    or not explain the benefits of cooperation with the

2    government, the fact that the government may recommend that

3    the court reduce the sentence?

4    A    Yeah, well, my policy is, I'll say this, Sally Lied I

5    think covered that pretty well during the hour we spent with

6    her, "If you cooperate with the government, the government

7    will cooperate with you."

8    Q    Okay, and when Sally Lied was making those statements,

9    was Mr. Mele present?

10   A    Yes.

11   Q    Okay, did Mr. Mele indicate that he didn't understand

12   those statements in any way?

13   A    Mr. Mele --

14        MS. STURM:  Objection.

15   A    Mr. Mele didn't indicate anything.

16        THE COURT:  Just a moment.

17        THE WITNESS:  I'm sorry.

18        MS. STURM:  Objection as to --

19        THE COURT:  I sustain the objection.

20        MS. STURM:  Thank you.

21   BY MS. FAWCETT:

22   Q    Did Mr. Mele say anything, without telling us what he

23   said, did he say anything when Miss Lied made those

24   statements?

25   A    My recollection is, no, he did not.

1    Q    All right, did you at any time tell Mr. Mele that he

2    was a central figure in this investigation, and because he

3    was a central figure in the investigation, he would have to

4    go to trial?

5    A    No.

6          MS. FAWCETT:  I have no further questions.

7          THE COURT:  Recross.

8                    RECROSS EXAMINATION

9    BY MS. STURM:

10   Q    Looking again at D 3 and looking at the telephone

11   record, what time of day do you have as the time of the note

12   that's D 3?

13   A    What's the time noted?

14   Q    Yes.

15   A    7:55 a.m.

16   Q    And what is the time of the telephone call that lasted

17   12 minutes?

18   A    I'm sorry, there was no phone call that lasted 12

19   minutes.

20   Q    I'm sorry, I'm sorry, five minutes.

21   A    That was at 8:12.

22   Q    Do you have any explanation as to why you put a time on

23   this note that occurred before the phone conversation?

24   A    Yeah, I didn't put the note -- the time on there.

25         THE COURT:  That's the person who received the

1    first call.  The 7:55 is the person who took the call that

2    left the note SBG call Mr. Mele.

3              MS. STURM:  Okay, thank you.  It wasn't clear to me

4    that this was -- from my copy it's not clear that it

5    initiated as a -- thank you.

6              I don't have any further questions of the witness,

7    Your Honor.

8              THE COURT:  Thank you, sir.

9              THE WITNESS:  May I be excused, Your Honor?

10             THE COURT:  Any objection to his being excused?

11             MS. FAWCETT:  No, Your Honor.

12             MS. STURM:  No, Your Honor.

13             THE COURT:  You're excused.

14             (Smith B. Gephart concluded as the witness.)

15

16             I hereby certify that the proceedings and evidence

17   of the court are contained fully and accurately in the notes

18   taken by me on the testimony of Smith B. Gephart from the

19   hearing of the within cause and that this is a correct

20   transcript of the same.

21             *Monica L. Zamiska*

22             Monica L. Zamiska, RPR

23             Official Court Reporter

24

25