

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3    UNITED STATES OF AMERICA        :

4            v.                :    CRIMINAL NO. 01-CR-224-01

5    ALFRED A. MELE,                :
                    Defendant

6

7

8

9                TRANSCRIPT OF PROCEEDINGS

10               HEARING ON A 2255 MOTION

11          Before:   Hon. Sylvia H. Rambo, Senior Judge

12          Date:   July 25, 2003

13          Place:   Courtroom No. 3
                    Federal Building
14                  Harrisburg, Pa.



15

16

17    COUNSEL PRESENT:

18        CHRISTY H. FAWCETT, Assistant U.S. Attorney

19            For - Government

20        CHERYL J. STURM, Esquire

21            For - Defendant

22

23

24

25                          Monica L. Zamiska, RPR
                            Official Court Reporter

1                        INDEX TO WITNESSES

2                              Direct  Cross  Redirect  Recross

3       For the Defendant:

4       Dennis E. Boyle              5      13

5       Maryann Mele               18      19

6       Alfred Mele                19      29      35        38

7       For the Government:

8       Smith B. Gephart           41
          (complete testimony found in separate transcript)
9

10                        INDEX TO EXHIBITS

11                                          Identified  Admitted

12      For the Government:

13      G X 1 (Gephart Commonwealth Telephone                42
              records 5-99)
14      G X 2 (Gephart Commonwealth Telephone                42
              records 5-99)
15      G X 3 (5-27-99 Gephart handwritten notes)            42

16      G X 4 (5-17-03 Castigar letter)          42          42

17      G X 5 (5-17-03 letter)                   42          42

18      For the Defendant:

19      D X 1 (Mele-Part A presentence report)   17          42

20      D X 2 (Mele-Part B presentence report)   17          42

21      D X 3 (Mele 2255 motion)                 37          42

22      D X 4 (7-10-03 01-CR-224 docket entry)   41          42

23      D X 5 (7-15-03 01-CR-219 docket entry)   41          42

24      D X 6 (7-15-03 01-CR-226 docket entry)   41          42

25      D X 7 (7-15-03 01-CR-223 docket entry)   41          42

1    D X 8 (7-15-03 01-CR-222 docket entry)          41          42

2    D X 9 (7-15-03 01-CR-221 docket entry)          41          42

3    D X 10 (7-15-03 01-CR-220 docket entry)          41          42

4    D X 11 (7-15-03 01-CR-218 docket entry)          41          42

5    D X 12 (7-15-03 01-CR-225 docket entry)          41          42

6    D X 13 (Government's response to                            42
            2255 motion)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning, everyone.

2          MS. FAWCETT:  Good morning, Your Honor.

3          MS. STURM:  Good morning, Your Honor.

4          THE COURT:  This is the time and place for the

5    hearing on the 2255 motion of Alfred Mele.  Are we ready to

6    proceed?

7          MS. STURM:  We are, Your Honor.

8          THE COURT:  Proceed.

9          MS. STURM:  Thank you.  Your Honor, we request to

10   sequester the witnesses.

11          THE COURT:  That's fine.  Anybody who is here as a

12   witness in this case may step out in the hall.  Well, I don't

13   know whether --

14          MS. STURM:  If I could just advise the Court, that

15   it was my intention to call Mr. Boyle first, with the Court's

16   permission, so it would be Mr. Gephart and Mrs. Mele.

17          THE COURT:  Okay, fine.

18          (The witnesses left the courtroom.)

19          THE COURT:  Mr. Boyle, do you want to take the

20   stand?

21          THE WITNESS:  Yes, Your Honor.

22          DENNIS E. BOYLE, called as a witness, being duly

23   sworn or affirmed, testified as follows:

24          THE CLERK:  Would you state your name for the

25   record please.

1          THE WITNESS:  Dennis E. Boyle.

2          THE CLERK:  And would you spell your last name

3    please.

4          THE WITNESS:  B-o-y-l-e.

5          THE CLERK:  Thank you.

6                    DIRECT EXAMINATION

7    BY MS. STURM:

8    Q    Mr. Boyle, would you state your occupation please.

9    A    Yes, I'm an attorney.

10   Q    And your business address?

11   A    200 North Third Street, P.O. Box 810, Harrisburg,

12   Pennsylvania  17108.

13   Q    And how many years have you been practicing law?

14   A    About 16.

15   Q    And do you have an estimate as to how many federal

16   criminal cases you had handled at the time that you began

17   representing Mr. Mele?

18   A    It had been several.  I don't have an estimate at this

19   point in time.

20   Q    And is it correct that at some point in time you did

21   begin representing the defendant here, Alfred Mele?

22   A    Yes, that's true.

23   Q    And do you recall when you began representing him?

24   A    It was approximately October 3 or 4 of the year 2000.

25   The CJA 20 form was actually signed on the 5th, but I

1    received a memo from the court on the 3rd.

2    Q    And were you retained or appointed?

3    A    I was appointed.

4    Q    And what was the status of the case when you began

5    representing Mr. Mele?

6    A    Mr. Mele had received a target letter.  There had not

7    been an indictment or information issued at that point in

8    time.

9    Q    When did you first meet with Mr. Mele?

10   A    I believe I met with Mr. Mele on October 4.

11   Q    Of the year --

12   A    Of the year 2000.

13   Q    Thank you, and who was the Assistant United States

14   Attorney assigned to Mr. Mele's case?

15   A    It was Christy Fawcett.

16   Q    Did you have any discussions with Miss Fawcett prior to

17   meeting with Mr. Mele?

18   A    Yes, I did.  I talked to Miss Fawcett, as I recall, I

19   think Miss Fawcett is the person who contacted me or shortly

20   after the clerk, who indicated that I would be appointed to

21   represent the case, and I went over briefly the facts, you

22   know, what the case was about.

23   Q    Was there any discussion of a possible plea agreement

24   from Mr. Mele in your discussions with Miss Fawcett at that

25   time?

1    A    I don't recall at that time if there was or not on that

2    first telephone conversation.

3    Q    At your first meeting with Mr. Mele did you have any

4    discussions with him as to whether he should enter a plea or

5    go to trial?

6         THE WITNESS:  Your Honor, at this time I think I

7    would need to make an objection based upon the

8    attorney/client privilege unless it's waived.

9         THE COURT:  Unless he waives it.

10        MS. STURM:  May I consult with my client for one

11   moment, Your Honor?

12        THE COURT:  Yes.

13        (Ms. Sturm and the defendant spoke off the record.)

14        MS. STURM:  Mr. Mele is willing to waive the

15   privilege, Your Honor.

16        THE COURT:  I think we need to put it on the

17   record.

18        MS. STURM:  Certainly.

19        THE COURT:  Mr. Mele, do you understand the nature

20   of the attorney/client privilege?  That means that

21   discussions that you have during representation between you

22   and your counsel, your counsel cannot be forced to relate any

23   conversations that have taken place in that position as

24   during attorney/client representation, and only you can waive

25   that.  Are you willing to waive that confidentiality?

1        THE DEFENDANT:  Yes, I am.

2        THE COURT:  Okay.  Go ahead.

3    A    I'm sorry, the question was --

4    BY MS. STURM:

5    Q    At your first meeting with Mr. Mele did you discuss

6    with him whether he should enter a plea or go to trial in

7    this matter?

8    A    I advised Mr. Mele of his options to either cooperate

9    with the government and try to work out a negotiated

10   settlement or his options to go to trial, if that's what he

11   chose to do.

12   Q    And what was Mr. Mele's response to a -- the

13   possibility of entering into a plea?

14   A    I think after we fully discussed it, Mr. Mele wanted to

15   cooperate with the government at that point in time.  Just in

16   terms of a plea, we did not have the specific plea agreement

17   available at that point in time, so there was no specific

18   plea discussed.  I just spoke to him in general terms about

19   what his rights were and sought his advice or his direction

20   as to whether we should go for a negotiated plea or start

21   preparing for trial, and at that time he wanted to work with

22   the government.

23   Q    And did working with the government include

24   cooperation?

25   A    Yes, it did.

1   Q     Did Mr. Mele voice any opposition to cooperation to

2   you?

3   A     Not that I recall.

4   Q     And did Mr. Mele cooperate with the government?

5   A     Yes, he did.

6   Q     Did Mr. Mele enter into a plea agreement while you were

7   representing him?

8   A     Yes, he did.

9   Q     And do you recall the dates -- the date on which the

10  plea agreement was signed by you and Mr. Mele?

11  A     Um, I recall that it was in mid October.

12  Q     Of the year --

13  A     Of the year 2000.

14  Q     And do you recall when the government signed the plea

15  agreement?

16          THE COURT:  Wouldn't that be a matter of record on

17  the actual plea agreement?

18  BY MS. STURM:

19  Q     Was there some passage of time between the time you and

20  Mr. Mele signed the plea agreement and the time the

21  government signed the plea agreement?

22  A     I can't recall offhand.  I can say there was quite a

23  passage of time between the time we signed the plea agreement

24  and the time the information was filed and the plea agreement

25  was filed with the court, but I don't recall specifically

1    when the government signed it.

2    Q    And do you recall the charges to which Mr. Mele pled

3    under the plea agreement?

4    A    Yes, I do.

5    Q    And what were those charges?

6    A    Money laundering and interstate -- it was a title

7    offense, as I recall.

8    Q    And did you have any discussions with Miss Fawcett as

9    to what charges Mr. Mele would be pleading to?

10   A    Yes, I did.

11   Q    And what, if anything, did you say to Miss Fawcett

12   regarding the charges?

13   A    When I became involved in the case, you know, I would

14   have liked to have avoided the money laundering charge, but I

15   was told by the government that that was not possible.

16   Q    And was a reason given to you as to why it was not

17   possible to drop the money laundering charge?

18   A    I was aware that Mr. Mele had been offered the

19   opportunity to cooperate I believe in 1999 and that he had

20   declined to cooperate at that period of time and that that

21   was -- was a reason or one of the reasons.

22   Q    And who told you that Mr. Mele had declined to

23   cooperate?

24   A    I believe Miss Fawcett did.

25   Q    Did Mr. Mele ever tell you that he had declined to

1    cooperate?

2    A    I believe -- I'm not sure about that phraseology.  Mr.

3    Mele was aware that he had been contacted by the government

4    in '99, and at that time there was no cooperation.

5    Q    Did he give you any explanation as to why there was no

6    cooperation?

7    A    He did.  This was -- the central thing to my way of

8    thinking at the time was that there had not been cooperation.

9    The reason why didn't really help me with my representation

10   of Mr. Mele.  As I recall, he had indicated that his attorney

11   had told him not to cooperate or something of that nature.  I

12   think, as I sit here, I recall Mr. Mele telling me that his

13   prior counsel had advised him not to cooperate.

14   Q    Did you have any discussions with Mr. Mele about

15   pleading guilty to the charge of money laundering?

16   A    Yes, I did.

17   Q    And what, if anything, did Mr. Mele say to you

18   regarding having to plead to the charge of money laundering?

19   A    Mr. Mele told me that that was not part of the original

20   agreement that had been offered to him and that he didn't

21   think he should have to plead to money laundering.

22   Q    Do you recall whether the fact that Mr. Mele pled

23   guilty to the charge of money laundering increased his

24   sentencing guidelines in any way?

25   A    Yes, it would have.

1    Q    And do you recall how that would have increased the

2    guidelines?

3    A    No, I do not.

4         MS. STURM:  Your Honor, with the Court's

5    permission, may I show the defendant a copy of the

6    presentence report?

7         THE COURT:  Yes.  The defendant or the witness?

8         MS. STURM:  I'm sorry, the witness.

9    BY MS. STURM:

10   Q    Mr. Boyle, could you look at page 4 of the presentence

11   investigation report.

12        THE COURT:  Hold on until I get my copy of it.  I

13   have it.  What page?

14        MS. STURM:  Page 4, Your Honor.  I'm looking at the

15   guideline calculations.

16        THE COURT:  Yes.

17   BY MS. STURM:

18   Q    Is there any points assessed for the charge of money

19   laundering?

20   A    The 2 point enhancement?

21   Q    Yes.

22   A    Yes.

23   Q    Okay, is that your understanding of how pleading to the

24   charge of money laundering impacted Mr. Mele's case?

25   A    Yes.

1    Q      Did Mr. Mele receive a downward departure for

2    cooperation?

3    A      Yes, he did.

4    Q      In your experience as a defense counsel is the

5    timeliness of cooperation important in the government's

6    recommendation for the extent of downward departure?

7    A      In my experience it has been, yes.

8    Q      Do you have an opinion in this case as to whether the

9    fact that Mr. Mele did not begin cooperating until you were

10   his attorney have any impact on the amount of downward

11   departure he received?

12   A      Yes, it's my opinion that had he cooperated sooner, he

13   would have gotten a greater downward departure.

14         MS. STURM:  I don't have any further questions at

15   this time, Your Honor.

16         THE COURT:  Cross examine.

17                     CROSS EXAMINATION

18   BY MS. FAWCETT:

19   Q      Mr. Boyle, were you aware at the time you began

20   discussing this case with Mr. Mele that other defendants or

21   other potential defendants in this case were cooperating with

22   the government as well?

23   A      Yes, I was.

24   Q      And did you convey that information to Mr. Mele?

25   A      Yes, I did.

1    Q    In your opinion did that information, the fact that

2    other defendants were cooperating and be cooperating against

3    him, affect his decision to cooperate with the government?

4    A    Um, I suppose it was a factor.  I didn't ask Mr. Mele

5    which factors caused him to cooperate.

6    Q    Did you advise Mr. Mele that because of the fact that

7    other defendants were cooperating in this case and would

8    potentially provide information regarding him it would be in

9    his best interest to cooperate?

10   A    Yes, I did.

11   Q    And are you aware of whether in 1999 other defendants

12   were cooperating with the government in this investigation at

13   the time Mr. Mele was represented by Mr. Gephart?

14   A    I was aware -- I'm not exactly sure what happened and

15   who was cooperating before my involvement in the case.  I'm

16   aware at the time that I met with Mele, Mr. Mele, there were

17   already people cooperating.

18   Q    Are you aware of whether or not Mr. Mele was one of the

19   first individuals who was approached for cooperation back in

20   1999?

21   A    It was my understanding he was one of the first

22   individuals approached.

23   Q    Okay.  That was, of course, at the time that he

24   declined to cooperate with the government?

25   A    That would be my understanding.

1    Q    And it is your understanding that at the time he

2    changed his mind and decided to cooperate with the government

3    he was aware through you and through your advice that a

4    number of other people were cooperating and would be

5    cooperating against him?

6    A    That's, that's correct.

7    Q    And you said, if I understand your testimony correctly,

8    that you recall a conversation in which your client conveyed

9    to you or you at least received the impression from your

10   client that he had been advised not to cooperate by his prior

11   counsel?

12   A    That's what he told me.

13   Q    Do you have anymore specific recollection of that

14   conversation?

15   A    I specifically recall the conversation.  I recall the

16   context that it came up in, and it came up in the context of

17   the plea to the money laundering charge in early October.  In

18   terms of more specific recollection, what do you mean?

19   Q    Do you remember anything else that he said to you or

20   you said to him?

21   A    No, we spoke for about two hours on that day.

22   Q    Okay, and you just indicated I believe that it came up

23   in the context of pleading to the money laundering charge?

24   A    That's correct.

25   Q    And can you explain that context?

1    A    Yes, Mr. -- after I had talked to you and gotten what I

2    believed the best deal we could get for Mr. Mele was, I

3    presented it to Mr. Mele.  It included a charge of money

4    laundering.  Mr. Mele told me that the initial offer to him

5    did not require him to plead to money laundering and that

6    therefore he didn't think he should have to plead to money

7    laundering at this point in time.  I explained to him that in

8    my opinion and my experience that probably the timeliness of

9    the cooperation changed the circumstances that he would be

10    able to plead under.  We also talked about the elements of

11    money laundering, what activities constituted money

12    laundering and whether the activity he engaged in constituted

13    money laundering.

14    Q    Did you do anything to memorialize your recollection of

15    that conversation, specifically the portion of the

16    conversation that you recall the defendant telling you that

17    his prior attorney had told him not to cooperate?

18    A    I did not.

19            MS. FAWCETT:  I have no further questions.

20            THE COURT:  Redirect.

21            MS. STURM:  None, Your Honor.

22            THE COURT:  You may step down.

23            THE WITNESS:  Thank you, Your Honor.

24            Your Honor, are these exhibits?

25            THE COURT:  Just leave them there.  Thank you.  Are

1    those exhibits numbered?

2              MS. STURM:  It was the presentence investigation

3    report.

4              THE COURT:  Do they have an exhibit number?

5              MS. STURM:  They don't.  I can add it so that it's

6    now considered part of the record.  May I mark it as P 1?

7              THE COURT:  Yes.  Are they separate?

8              MS. STURM:  This is just the instructions that come

9    -- sorry, it is separate, Your Honor, P 1 and P 2.

10             THE COURT:  Thank you.  Are you going to leave them

11   up there then?

12             MS. STURM:  Yes.

13             THE COURT:  Just put them right here.

14             MS. STURM:  Your Honor, with the Court's permission

15   I call Maryann Mele to the stand.

16             THE COURT:  Okay.  You'll have to get her from

17   outside.

18             MARYANN MELE, called as a witness, being duly sworn

19   or affirmed, testified as follows:

20             THE CLERK:  And would you state your name please.

21             THE WITNESS:  Maryann Mele.

22             THE COURT:  Speak into the microphone.

23             THE WITNESS:  Maryann Mele.

24             THE CLERK:  Would you spell your first name?

25             THE WITNESS:  M-a-r-y-a-n-n.

1          THE COURT:  Two words or one word?

2          THE WITNESS:  One.

3                    DIRECT EXAMINATION

4    BY MS. STURM:

5    Q    State your address for the record please, Mrs. Mele.

6    A    36 Bradford Street.

7    Q    And where is that?

8    A    That's Old Bridge, New Jersey.

9    Q    And what is your relationship to the defendant Alfred

10   Mele?

11   A    He's my husband.

12   Q    Were you aware that your husband had hired an attorney

13   Bart Gephart?

14   A    Yes.

15   Q    And did you at any time have any conversation with Mr.

16   Gephart in person?

17   A    No.

18   Q    Did you at any time have any conversation with Mr.

19   Gephart over the telephone?

20   A    No.

21   Q    Did you at any time tell Mr. Gephart that your husband

22   was not interested in pleading guilty?

23   A    No.

24          MS. STURM:  No further questions, Your Honor.

25          THE COURT:  Cross.

1                        CROSS EXAMINATION

2    BY MS. FAWCETT:

3    Q    You have no memorialization of your lack of

4    conversations with Mr. Gephart.  Is that correct, Mrs. Mele?

5    A    Uh-huh.

6            MS. FAWCETT:  I have no further questions.

7            THE COURT:  You may step down.

8            MS. STURM:  Your Honor, the Court calls Alfred

9    Mele.  I'm sorry, defense calls Alfred Mele.

10           ALFRED MELE, called as a witness, being duly sworn

11   or affirmed, testified as follows:

12           THE CLERK:  Would you state your name please.

13           THE WITNESS:  Alfred Mele.

14           THE CLERK:  Thank you.

15                     DIRECT EXAMINATION

16   BY MS. STURM:

17   Q    Mr. Mele, could you tell the Court what your present

18   designation is?

19   A    Where I am now?

20   Q    Yes.

21   A    Schuylkill Camp.

22   Q    And when did you learn you were under investigation by

23   federal authorities?

24   A    When my wife was home, they came to my house and left a

25   card.

1    Q    Do you recall when that was?

2    A    No.

3    Q    What was your first contact with any government

4    representative from the U.S. Attorney's Office?

5    A    I called Agent Stewart and just made a date for me to

6    come down there.

7    Q    After you spoke to Agent Stewart did you contact any

8    attorney?

9    A    Yes.

10    Q    And who was that?

11    A    I called an attorney, but it was his machine, and it

12    was in Columbia, I forget his name, but about two, three days

13    before I had to come down he got back to me and recommended

14    Bart Gephart.

15    Q    And did you hire Mr. Gephart to represent you?

16    A    Yes, I -- yes.

17    Q    And when was the first time you met with Mr. Gephart?

18    A    At his office.

19    Q    And you --

20         THE COURT:  Wait a minute, he's been asked a couple

21    of times about when, and we have yet to get any dates.

22    BY MS. STURM:

23    Q    Do you recall the year in which you met with Mr.

24    Gephart?

25    A    I guess 2000.

1    Q    Do you recall the occasion that caused you to come and

2    meet with Mr. Gephart?

3    A    Oh, I had to go up and talk to Sally Ride and Agent

4    Stewart.

5    Q    Was that your first meeting with anybody from the U.S.

6    Attorney's Office?

7    A    Yes.

8    Q    And where did you meet with Mr. Gephart?

9    A    In his office.

10    Q    And what did you and Mr. Gephart discuss at that

11    meeting?

12    A    When I first came in?

13    Q    Yes.

14    A    Nothing.  I just told him my name, introduced myself,

15    and then he made a phone call, and he said to -- "Okay, let's

16    go up."

17    Q    And where did you and Mr. Gephart go?

18    A    To the Federal Building.

19    Q    And who did you meet with there?

20    A    With U.S. Attorney Sally Ride --

21         THE COURT:  I think the name is Lied, L-i- --

22    A    Lied, Lied, sorry, and Agent Stewart.

23    BY MS. STURM:

24    Q    And did you do anything else besides meet with these

25    two individuals in the courthouse, I'm sorry, in the Federal

1    Building?

2    A    No.

3    Q    Did you look at any papers that day?

4    A    Yes.

5    Q    And what kinds of papers were they?

6    A    Papers that I had signed in purchasing cars.

7    Q    Were there papers bearing your names then, your name?

8    A    Not my exact name, no, names that I wrote, fictitious

9    names.

10    Q    Were there documents that had your handwriting on them?

11    A    Handwriting on them, yes.

12    Q    And did they -- what did the documents have to do with?

13    A    Purchasing the cars.

14         THE COURT:  Car titles?

15         THE WITNESS:  They were some titles and other

16    paperwork, bill-of-sales.

17    BY MS. STURM:

18    Q    Before you went over to the Federal Building that day

19    did Mr. Gephart give you any advice about what to do or not

20    to do?

21    A    Yes, he said, "You need not say anything at this time."

22    Q    Did Mr. Gephart review the papers with you that you

23    were looking at in the Federal Building?

24    A    No.

25    Q    After you left the U.S. Attorney's Office did Mr.

1    Gephart give you any advice as to the strength of the

2    government's case against you?

3    A    No.

4    Q    What happened after you and Mr. Gephart finished your

5    review of the papers at the U.S. Attorney's Office?

6    A    Well, he said to wait down in his office for him and he

7    would be down shortly.  So I went down, and then shortly he

8    came down, and do you want me to say the whole thing what

9    happened in the office?

10   Q    Yes, would you tell us what Mr. Gephart said when he

11   returned to the office and met with you?

12   A    He said -- he came down, and he said, "They offered to

13   drop the money laundering charge and to leave your son alone

14   for your cooperation."  So I said, "Oh, okay."  Then he said,

15   "Tell me exactly your involvement in this case."  So I

16   started telling him about my involvement.  And shortly

17   thereafter, maybe 10, 15 minutes later as I was speaking, he

18   interrupted me and said, "You're more of a central figure."

19   He said, "Forget it."  He said, "I don't do trial work

20   anymore," he said, "but I have an associate in the office

21   here that is an excellent trial lawyer," and then he said a

22   few other things.  And then he said -- looked at me and said,

23   "You're free to go now."  So I said, "I'm free to go?"  He

24   said, "Yes, you're free to go," and I left.

25   Q    And did you -- how did you interpret Mr. Gephart's

1    statement when he said to --

2    A    I --

3        THE COURT:  Let her finish the question.

4    BY MS. STURM:

5    Q    -- when he said forget it, how did you interpret that

6    statement?

7    A    They didn't want my -- they didn't want me to -- they

8    didn't want my cooperation, and they wanted to take me to

9    trial.  As soon as he mentioned that he doesn't do trial work

10   anymore, that's what he was telling me.

11   Q    Did you tell Mr. Gephart on the day that you went to

12   the Federal Building and the same day that you're talking

13   about this meeting in his office, did you tell him that day

14   that you were not interested in pleading guilty?

15   A    No.

16   Q    Did you tell him on that day that you were not

17   interested in cooperating with the government?

18   A    No.

19   Q    Did you ever tell Mr. Gephart that you were not

20   interested in pleading guilty?

21   A    No.

22   Q    Did you ever relay -- did you ever tell Mr. Gephart you

23   were not interested in cooperating with the government?

24   A    No.

25   Q    Did you ever relay a message to Mr. Gephart through

1    anyone else that you were not interested in pleading guilty

2    in this case?

3    A    No.

4    Q    Did you ever relay a message to Mr. Gephart through

5    anyone else that you were not interested in cooperating in

6    this case?

7    A    No.

8    Q    To your knowledge did your wife call Mr. Gephart and

9    tell him you would not enter into a plea agreement?

10   A    No.

11   Q    Did you tell your wife you were not interested in a

12   plea agreement?

13   A    Did I tell her --

14   Q    Did you tell your wife you were not interested in a

15   plea agreement?

16   A    No, no.

17   Q    Did Mr. Gephart at any time advise you that you should

18   plead guilty and cooperate in this case?

19   A    No.

20   Q    Did Mr. Gephart ever tell you of a general rule that

21   people who plead guilty early receive a lower sentence than

22   those who plead later?

23   A    No.

24   Q    Did Mr. Gephart at any time explain to you that there

25   are sentencing guidelines that would determine the range of

1    your sentence?

2    A    No.

3    Q    Did he explain federal sentencing guidelines to you in

4    any way?

5    A    No.

6    Q    Did he explain the crime of money laundering to you?

7    A    No.

8    Q    Did Mr. Gephart explain the crime of conspiracy to

9    commit interstate transportation of falsely made and forged

10   securities to you?

11   A    No.

12   Q    If Mr. Gephart had informed you that the smartest

13   course of action was to plead guilty and cooperate, what

14   would you have done?

15   A    Pled guilty, cooperate.

16   Q    At any time after the day on which you and Mr. Gephart

17   met at the Federal Building did Mr. Gephart contact you about

18   the case?

19   A    No.

20   Q    At some point in time you had a lawyer other than Mr.

21   Gephart.  Is that correct?

22   A    Yes.

23   Q    And who was that lawyer?

24   A    Dennis Boyle, Dennis E. Boyle.

25   Q    And did you enter into a plea agreement when Mr. Boyle

1   was representing you?

2   A    Yes.

3   Q    Did you cooperate with the government after Mr. Boyle

4   was representing you?

5   A    Yes.

6   Q    How long were you represented by Mr. Boyle before you

7   agreed to plead guilty?

8   A    That same day.

9        THE COURT:  Wait, wait, wait.  What was the

10  question?  What was the answer?

11  BY MS. STURM:

12  Q    How long were you represented by Mr. Boyle before you

13  agreed to plead guilty?

14  A    How long, that same day.  He represented me that day,

15  and I pled that day.

16  Q    How long were you represented by Mr. Boyle before you

17  agreed to cooperate?

18  A    How long, that day, that day he represented me.

19  Q    What advice, if any, did Mr. Boyle give you about

20  whether to go to trial or plead guilty?

21  A    No, he, he told me to plead guilty, told me to

22  cooperate.

23  Q    Did you cooperate?

24  A    Yes.

25  Q    And what did that consist of?

1    A    Cooperation?

2    Q    Yes.

3    A    Of telling them my involvement in the case and how I

4    bought the cars, how I sold them and how I cashed the checks,

5    involved everything.

6    Q    And how long a period of time did you spend cooperating

7    with the government?

8    A    Oh, came down about five times down to the Federal

9    Building here.

10   Q    Was that at your expense?

11   A    My expense, yes.

12   Q    Did you ever refuse to appear and --

13   A    No, no.

14        THE COURT:  Would you let her finish the question

15   before you respond.

16        THE WITNESS:  Sorry.

17   BY MS. STURM:

18   Q    Did you ever refuse to appear and be debriefed by the

19   government after you began your cooperation?

20   A    No.

21   Q    Did the plead agreement that you entered into require

22   that you plead to a money laundering count?

23   A    Yes.

24   Q    Did you ask Mr. Boyle why the plea agreement he

25   presented to you included a money laundering count?

1    A    Yes.

2    Q    What did Mr. Boyle tell you?

3    A    Said because I didn't come forward the first time.

4    Q    And what's the reason that you hadn't come forward

5    earlier?

6    A    I told him -- I told him that Mr. Gephart relayed that

7    they took the plea off the table by telling me that I had to

8    go to trial.

9         MS. STURM:  I have no further questions, Your

10   Honor.

11        THE COURT:  Cross examine.

12                    CROSS EXAMINATION

13

14   BY MS. FAWCETT:

15   Q    Mr. Mele, during the period that you were represented

16   by Mr. Gephart, where were you residing?

17   A    I was residing at Staten Island.

18   Q    And what was your telephone number at your residence in

19   Staten Island?

20   A    356-0129.

21   Q    And is it your testimony that --

22        THE COURT:  Wait a minute, can I have that

23   telephone number again?

24        THE WITNESS:  356-0129.

25   BY MS. FAWCETT:

1   Q     Would that be area code 718-356-0129?

2   A     Yes, yes.

3          THE COURT:  What was that area code again, I'm

4   sorry?

5          MS. FAWCETT:    718, Your Honor.

6          THE COURT:  Thank you.

7   BY MS. FAWCETT:

8   Q     And if I understand your testimony correctly, your

9   testimony is that after that initial meeting with Agent

10  Stewart, A.U.S.A. Sally Lied and Attorney Gephart you never

11  spoke to Attorney Gephart after that?

12  A     I spoke to him once.  I called him up to tell him how

13  much I owed him, how much I owed.

14  Q     Okay, during that conversation where you talked to him

15  about how much you owed him, did you have any conversation

16  about your case?

17  A     No.

18  Q     And how long after your meeting with Sally Lied, Jim

19  Stewart and Attorney Gephart did you have this telephone

20  conversation with Attorney Gephart where you talked about how

21  much you owed him?

22  A     About two weeks later.

23  Q     And who called who during that conversation?

24  A     I called him.

25  Q     If I understand your testimony correctly, you told us

1    that you received the impression or you formed the impression

2    following your conversation with Attorney Gephart that the

3    deal was off the table and you had no choice but to go to

4    trial.  Is that correct?

5    A    Yes.

6    Q    Did you -- did you or did you not testify that during

7    the meeting that you had with Agent Stewart and Sally Lied,

8    following that meeting Attorney Gephart met with them, came

9    back and told you that they wanted you to cooperate and that

10   in return for your cooperation, they would drop the money

11   laundering charge?

12   A    Yes.

13   Q    But you're telling us that you still formed the

14   impression from that same conversation that the cooperation

15   deal was off the table?

16   A    Yes.

17   Q    Okay.

18   A    He says I'm a central figure.  He says forget it.

19   Q    Isn't it true that at the time you met with Miss Lied

20   and Mr. Stewart and Mr. Gephart you were not aware of other

21   individuals who were cooperating in this case and who might

22   provide information against you?

23   A    Yeah, I think I was aware of people that might have

24   come forward, yes.

25   Q    Isn't it true that at the time you met with them you

1    were told that you were one of the first individuals that

2    they were approaching for cooperation?

3    A    I don't recall.

4    Q    I believe your testimony was that you first became

5    aware that you were being investigated because somebody left

6    a card at your door, at your residence in Staten Island?

7    A    Yes, yes.

8    Q    Whose card was that?

9    A    Agent Stewart's.

10   Q    Okay, and your recollection is that that was sometime

11   in the year 2000?

12   A    Or around, I'm not positive.

13   Q    Right, and your testimony was that prior to the meeting

14   with Agent Stewart and Miss Lied you went to Attorney

15   Gephart's office and you discussed nothing?

16   A    Discussed what I said before, yes.  That's what I said

17   before, we discussed -- he just asked me what my involvement

18   was.

19   Q    Prior to the meeting with Agent Stewart and Miss Lied

20   --

21   A    Oh, prior to that?

22   Q    Yes.

23   A    No.

24   Q    You discussed nothing?

25   A    Nothing.

1    Q      And how long approximately was your meeting with Mr.

2    Gephart prior to your meeting with Mr. Stewart and Miss Lied?

3    A      Five minutes, 10 minutes.  I just waited.  He had to

4    make a phone call.

5    Q      And what is your recollection concerning how long --

6    how long the meeting with Mr. Stewart and Miss Lied took

7    place, how long a meeting was that?

8    A      In the Federal Building --

9    Q      Yes.

10   A      -- how long?  A meeting say about a half hour or so, 45

11   minutes.

12   Q      And your best recollection concerning how long the

13   meeting that you had with Mr. Gephart after that meeting?

14   A      Twenty minutes, 15, 20 minutes.

15   Q      Prior to the time you initially met with Mr. Stewart

16   and Miss Lied had you received any sort of a target letter

17   from the government telling you that you were the target of a

18   federal investigation?

19   A      Yes.

20   Q      You had?

21   A      No.  Oh, prior to that, no.

22   Q      Okay, and prior --

23          THE COURT:  Wait a minute, what was the question?

24          MS. FAWCETT:  The question was prior to the time

25   you initially -- he initially met with Mr. Stewart and Miss

1    Lied had he received a target letter from the government.

2            THE WITNESS:  I don't recall, no.

3    BY MS. FAWCETT:

4    Q    Prior to the time you met with myself, Mr. Stewart and

5    Dennis Boyle you had received a target letter from the

6    government.  Is that correct?

7    A    Yes.

8    Q    And you were aware at that time that other individuals

9    who were involved in this investigation were cooperating and

10   were cooperating against you?

11   A    I wouldn't say I was aware of people cooperating

12   against me.

13   Q    Did you --

14   A    I -- I knew there would be though.

15   Q    Okay.  Is it fair to say you had discussions with Mr.

16   Boyle concerning the fact that there were other people

17   involved in this investigation who would be or were

18   cooperating against you?

19   A    I don't recall.

20   Q    You don't recall whether or not you had conversations

21   with Mr. Boyle?

22   A    I don't think I did about other people, no.

23   Q    And your recollection of these events, have they been

24   -- has your recollection been memorialized in any way?

25   A    Been what?

1    Q    Your recollection of all these events that you have

2    been telling us about, these meetings and so forth, have you

3    written down your recollection in any way?

4    A    Have I written down?

5    Q    Yes.

6    A    No.

7    Q    You did not take notes at the time these events

8    occurred about what was occurring?

9    A    No, no.

10         MS. FAWCETT:  I have no further questions, Your

11    Honor.

12         THE COURT:  Redirect.

13                    REDIRECT EXAMINATION

14    BY MS. STURM:

15    Q    Mr. Mele, prior to your coming down to meet with Mr.

16    Gephart for the first time were you aware of any arrests that

17    had been made in connection with the crime that brings you

18    here today?

19    A    I know people who are under investigation, yes.

20    Q    You knew that before you met with Mr. Gephart?

21    A    Yeah, my salesman, the one who was selling cars.

22    Q    What had happened to him?

23    A    Well, he said they said he was, you know, being

24    investigated.

25    Q    Had he told you that?

1    A     Yes.

2    Q     Was there anyone else that you were aware was under

3    investigation at the time you came down to meet with Mr.

4    Gephart?

5    A     Where I bought the cars, Merchants Rent-A-Car, that

6    salesman was being questioned.

7    Q     Would your -- would the salesman who worked for you

8    have anything incriminating to say about you?

9    A     Yes.

10   Q     Would the person who was the salesman at the dealership

11   where you purchased the cars, would he have something

12   incriminating to say about you?

13   A     Yes.

14   Q     When you looked at the documents in the Federal

15   Building, were those documents incriminating to you?

16   A     Yes.

17   Q     When you met with Mr. Gephart before going over to the

18   Federal Building, did Mr. Gephart give you any advice as to

19   how to behave when you got to the Federal Building, what to

20   do?

21   A     All he said was, "You need not say anything at this

22   time."

23        MS. STURM:  Your Honor, with the Court's

24   permission, may I show the witness a copy of the 2255 motion

25   filed in this matter?

1          THE COURT:  Certainly.

2          THE WITNESS:  I need my glasses from on the table.

3          MS. STURM:  Your Honor, may I have it marked as

4     P 3.

5     A     The glasses, thank you.

6     BY MS. STURM:

7     Q     Mr. Mele, is this the 2255 motion that you prepared?

8     A     Yes, it is.

9     Q     Did you prepare it?

10    A     Yes.

11    Q     Is there a handwritten statement that you filed with

12    the 2255 motion?

13    A     Yes.

14    Q     Is it contained within the document I just gave you?

15    A     Yes, it is.

16    Q     Could you read it through to yourself please.

17    A     Read it?

18    Q     Just to yourself.  Could you look up when you are

19    finished reading.

20    A     (Witness reading.)

21    Q     Are those your words in that statement, Mr. Mele?

22    A     Yes.

23    Q     Is there anything in there that's not truthful?

24    A     No.

25    Q     Is there anything in there that you would withdraw from

1    today?

2    A    No.

3             MS. STURM:  No further questions, Your Honor.

4             THE COURT:  Cross.  Recross

5                    RECROSS EXAMINATION

6    BY MS. FAWCETT:

7    Q    Mr. Mele, if I understand your testimony correctly, you

8    said that you were aware that your salesman was also under

9    investigation at the time Attorney Gephart represented you.

10   Correct?

11   A    (Shook head up and down.)

12   Q    And what is your --

13            THE COURT:  Is that a yes?  I didn't get the first

14   response.

15            MS. FAWCETT:  I believe there was a nod of yes.

16            THE COURT:  Please say yes or no.

17            THE WITNESS:  Yes.

18   BY MS. FAWCETT:

19   Q    And what is your salesman's name?

20   A    Scott Phillips.

21   Q    And you said that you were aware that a salesman at

22   Merchants Rent-A-Car was also under investigation.  Is that

23   correct?

24   A    Yes.

25   Q    And what is the salesman's --

1    A    Allen Singer.

2    Q    Excuse me?

3    A    Allen Singer.

4    Q    And did you talk to either Scott Philips or Allen

5    Singer concerning the investigation?

6    A    Not concerning, no, I didn't, not concerning the

7    investigation, I did not talk to them about that.

8    Q    Okay.  Did you talk to them concerning whether or not

9    they were cooperating with the government?

10         MS. STURM:  Can we have the time period for this

11    please, Your Honor.

12         THE COURT:  Well, he has to put the time.  He said

13    that he was aware, and I think she's asking at the time he

14    was aware did he talk to them.  That's my interpretation of

15    the question.

16         MS. FAWCETT:  Your Honor, I believe that's correct,

17    the initial question was directed to during the time period

18    he was represented by Mr. Gephart.

19         THE COURT:  I'm sorry, let's rephrase the question.

20    BY MS. FAWCETT:

21    Q    If I understand your testimony correctly, you told us

22    that during the time period that you were represented by Mr.

23    Gephart you were aware that Scott Phillips and Allen Singer

24    were also the targets of a federal investigation.  Is that

25    correct?

1    A    I -- yes, I was aware they were under investigation.

2    Q    All right, during that time period, during the time

3    period you were represented by Mr. Gephart, did you have

4    conversations with either Allen Singer or Scott Phillips

5    concerning whether or not they were cooperating with the

6    government?

7    A    No, I didn't have conversations whether they were

8    cooperating.

9    Q    So you did not know whether Scott Phillips or Allen

10   Singer were cooperating with the government at that time.  Is

11   that correct?

12   A    Yes.

13   Q    You did not know that?

14   A    I didn't know if they were cooperating, but I knew they

15   were under investigation.

16        MS. FAWCETT:  All right, I have no further

17   questions.

18        THE COURT:  You may step down.

19        MS. STURM:  Your Honor, I don't have any further

20   testimony to present.  It's my understanding that the

21   government is calling Mr. Gephart as its witness.

22        MS. FAWCETT:  That's correct, Your Honor.

23        MS. STURM:  However, if the Court would permit, I

24   do have the docket entries printed off from Pacer of Mr. Mele

25   and the following defendants:  Scott Phillips; Richard Ball;

1    Dean Parasconda, P-a-r-a-s-c-o-n-d-a; Anselmo Plumitallo,

2    A-n-s-e-l-m-o P-l-u-m-i-t-a-l-l-o; Ralph Tufano, T-u-f-a-n-o;

3    Wesley Johnson; Salvadore Caliendo, C-a-l-i-e-n-d-o; Abraham

4    Zucker, Z-u-c-k-e-r; and I would request to introduce these

5    documents as records kept during the normal course of

6    business to establish the charges to which the

7    co-conspirators were allowed to plead and the sentences that

8    were imposed on the co-conspirators by Your Honor.

9            THE COURT:  Any objection?

10           MS. FAWCETT:  I have no objection to the documents.

11   I do have a comment with respect to whether or not that's

12   relevant to establish what's been alleged in the petition.

13           THE COURT:  You can argue that.

14           MS. FAWCETT:  At this point, Your Honor?

15           THE COURT:  No.

16           MS. STURM:  I believe that would be P 4 through 12

17   then, Your Honor.

18           THE COURT:  Okay, fine.

19           MS. STURM:  The petitioner would rest its case,

20   Your Honor.

21           THE COURT:  Miss Fawcett.

22           (The testimony of the next witness, Smith B.

23   Gephart, can be found in it's entirety in a separate

24   transcript.)

25           THE COURT:  Any further witnesses?

42

1          MS. FAWCETT:  No, Your Honor.

2          THE COURT:  I'll entertain brief argument from both

3   of you.

4          MS. FAWCETT:  May I move for the admission of our

5   exhibits, Your Honor?

6          THE COURT:  Yes, yes.

7          MS. FAWCETT:  I would like to move for the

8   admission of Exhibits 1 through 3.  I think there has also

9   been testimony concerning two letters which have not been

10  marked.  I'll mark them Exhibit 4 and 5 and move for their

11  admission as well.

12         THE COURT:  Any objection?

13         MS. STURM:  I don't object, Your Honor, and I would

14  move for the admission of plaintiff's exhibits as well.

15         THE COURT:  They're admitted.

16         Just for everybody's sake, the letter that starts

17  with the purpose -- I don't know which May 17 letter should

18  come first, so -- is there a difference?

19         MS. FAWCETT:  One is the Castigar letter, and I had

20  intended to mark that as No. 4, and that is the one that

21  starts as you know --

22         THE COURT:  Okay, that would be Government Exhibit

23  4.  Next would be Government Exhibit 5.  Okay.

24         Monica, you don't have to take the argument unless

25  counsel wants the argument on the record.

1           MS. FAWCETT:  No, Your Honor.

2           MS. STURM:  No, Your Honor.

3           (Ms. Sturm made an argument off the record.)

4           THE COURT:  You better put this on the record,

5    Monica.  On a memo to me from the probation officer May 9,

6    2002, a recent discussion about Mr. Mele and Mr. Zucker's

7    money laundering offenses -- then there is a lot there --

8    A.U.S.A. Christy Fawcett candidly noted that while all the

9    defendants likely laundered proceeds of the scheme through

10   the purchase of additional cars, in Mele's and Zucker's cases

11   the government has actual checks that they endorsed over to

12   Merchants Rent-A-Car to buy more automobiles.  This evidence

13   was apparently used by the government in plea negotiations,

14   and the defendants later agreed to plead to money laundering.

15   So it was apparently that piece of evidence against Zucker

16   and Mele that they didn't have against the other defendants.

17          MS. FAWCETT:  May I address that briefly, Your

18   Honor?  That is the issue that I was concerned about earlier

19   when I indicated to the Court that there was something I

20   wanted to present argument about.  The disparity in what the

21   charges -- in what charges the defendant pled to was not

22   something that was raised in a 2255 petition.  The first time

23   that that comes up is in the memorandum of law that was

24   served on me yesterday afternoon.  Because of that I did not

25   prepare to either have somebody either question me about that

1       or question Agent Stewart about that.   If the Court thinks

2       that that is going to be important in its decision, I would

3       request that we be able to bring in a witness, either myself

4       or Agent Stewart.

5              However, I will represent to the Court exactly what

6       is in that document.  I wasn't aware that document existed,

7       but I will represent as an officer of the court that the

8       government's case as to money laundering, although we

9       certainly suspected the other defendants may have been

10      involved in money laundering as well, what we had with

11      respect to Mr. Zucker and Mr. Mele was we had checks that

12      were, as I recall, checks from Merchants or checks from

13      Manheim Auto Auction for the sale of cars that were cars sold

14      in this odometer scheme through Manheim Auto Auction.  Those

15      checks were then taken back up by Mr. Zucker and Mr. Mele to

16      Merchants Rent-A-Car to purchase more cars that were then

17      made part of this whole process.  Because of that we felt

18      that we had documentary evidence which established a charge

19      of money laundering against those two but not against the

20      other defendants.  Again I wasn't prepared to respond to that

21      with testimony because it was only raised in the memorandum

22      of law that I received late yesterday afternoon.

23              THE COURT:  Go ahead.

24              MS. STURM:  Your Honor, in any event, there was

25      testimony that was part of plea negotiations that the money

1    laundering count could have been dropped if Mr. Mele had

2    cooperated sooner, and although Mr. Mele and Mr. Ball were

3    supposed to be partners, and that's how they were described

4    in the presentence report, Mr. Ball received a sentence of 12

5    months, and the sentences ranged from 6 months to 15 months

6    otherwise, and Mr. Zucker, even with the money laundering

7    charge, received a sentence of 24 months.  So we have Mr.

8    Mele certainly was not the central figure in this offense

9    receiving a sentence of 30 months despite what the government

10   described as valuable cooperation.  The government also

11   tempered that by saying that the cooperation was late, that

12   he had been given an opportunity before.

13              In Stricklin v. Washington --

14              THE COURT:  I'm familiar with the case.

15              MS. STURM:  All Mr. Mele needs to prove is that

16   there is a reasonable probability for the inadequate

17   assistance of counsel that caused the loss of a substantive

18   procedural right.

19              I assume the Court has also received my memorandum

20   of law, so I won't dwell on all the cases that I have cited

21   in there except to say that I think the overall tenor of the

22   cases that are cited is that Mr. Mele is entitled to

23   effective assistance of counsel in connection with the

24   decision whether to plead guilty or stand trial.

25              THE COURT:  I agree with the law.  I think the

1     issue we're facing is basically a factual situation.

2          MS. STURM:  But listening to the testimony of Mr.

3     Gephart, it is a classic Beria v. Keane case, classic day

4     case where Mr. Mele was entitled to the benefit of counsel to

5     understand the charges against him, to have some rudimentary

6     explanation of the guidelines, a meaningful explanation of

7     the guidelines, and most of all what the cases are uninanmous

8     on, Cullen, Day, Paders, Beria v. Keane, it is not sufficient

9     for defense counsel to say, "Here's two options to you, plead

10    guilty or go to trial.  Get back to me when you have made up

11    your mind what you want to do."  If there is anything that is

12    clear in that line of cases is that is not effective

13    assistance of counsel, but what Beria v. Keane says is

14    required is that the defendant's counsel must give him his

15    professional advice as to what is the best course of action

16    to him to resolve the charges against him.  He must give him

17    his professional advice, and it could not be clearer that at

18    this crucial proceedings by --

19          THE COURT:  You don't need to take this.

20          (Ms. Sturm continued her argument off the record.

21    Ms. Fawcett made an argument off the record.)

22          THE COURT:  I'll take the matter under advisement.

23          MS. STURM:  Your Honor, could the marshals be

24    notified by whomever it is that would need to know Mr. Mele

25    does have a number of health problems, that the writ is

1    satisfied and he can return to Schuylkill as soon as

2    possible?

3            THE COURT:  There is nothing detaining him,

4    whenever the marshal's schedule can get him there, they will

5    get him there.

6            MS. STURM:  Thank you, Your Honor.

7            (The proceedings concluded.)

8

9            I hereby certify that the proceedings and evidence

10    of the court are contained fully and accurately in the notes

11    taken by me on the hearing of the within cause and that this

12    is a correct transcript of the same.

13                    *Monica L. Zamiska*

14                    Monica L. Zamiska, RPR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25